317 Ga. 442
FINAL COPY

S23A0678. KIMBRO v. THE STATE.

WARREN, Justice.

Appellant Torrey Kimbro was convicted of malice murder and rape in connection with the strangling death of Diamond Shepherd.[1] In this appeal, Kimbro contends that the evidence presented at his trial was legally insufficient to support his convictions. He also claims that the trial court erred in the following ways: by denying his motion for new trial on the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21; by denying his motion for a continuance; by denying his motion to dismiss his indictment; by denying his motion

---

[1] Shepherd was killed on November 3, 2009. In April 2021, a Fulton County grand jury indicted Kimbro for malice murder, two counts of felony murder, and rape. At a trial from November 30 to December 6, 2021, a jury found him guilty of all counts. The trial court sentenced him as a recidivist to serve life in prison without the possibility of parole for murder and a concurrent life sentence (to serve 25 years in prison and the remainder on probation) for rape. The felony murder counts were vacated by operation of law. Kimbro filed a timely motion for new trial, which he amended three times through new counsel. After an evidentiary hearing, the trial court denied the motion in January 2023. Kimbro then filed a timely notice of appeal, which he later amended, and the case was docketed to the April 2023 term of this Court and submitted for a decision on the briefs.

for a mistrial; and by overruling his objections to certain statements that the prosecutor made during her closing argument. In addition, he claims that his trial counsel provided constitutionally ineffective assistance in several respects. As explained below, we affirm.

1. The evidence presented at Kimbro's trial showed the following. On November 3, 2009, Shepherd, who was 17 years old, was staying in a motel room near Fulton Industrial Boulevard in Atlanta with her boyfriend Edwin Perkins, Perkins's cousin, and the cousin's girlfriend. Around 3:00 p.m., investigators responded to a 911 call from a maintenance worker at the motel, who found Shepherd lying on her back on the floor of her room near the door, dead. A towel was covering her face; her shirt and bra were pushed up, exposing her breasts; her shorts were pulled down around her right ankle, exposing her vagina; and her legs were spread apart. Her purse was across her body, with the strap around her neck. Unopened condoms were strewn nearby. The bed had been moved, as if there had been a struggle. Investigators also observed "fluid leaking" from Shepherd's vagina.

Shepherd's boyfriend, Perkins, testified that Shepherd often had sex with men in exchange for money. He said that on the day Shepherd was killed, he and his cousin left the motel around 7:00 a.m. to run errands. Shepherd called him from the motel room phone around 12:00 or 12:30 p.m.[2] When he arrived back at the motel room with his cousin and the cousin's girlfriend, they saw investigators in the room and learned that Shepherd had been killed. The maintenance worker who discovered Shepherd's body testified that around 12:00 or 12:30 p.m., he was working on the breezeway near Shepherd's room when she passed by with a man who was "shorter than 6′2″" and "about 200 pounds" and had dreadlocks. The maintenance worker thought that the man was planning to pay Shepherd for sex. Shepherd asked the maintenance worker to let her and the man into her room because her key was not working; the maintenance worker let her in; and the man followed her. The maintenance worker saw the man leave about 45 minutes later, but

---

[2] During his interview with investigators on the day of the murder, Perkins said that Shepherd called him around 11:25 a.m.

he did not know if Shepherd left the room after that or if anyone else came to the room.[3]

The medical examiner who performed Shepherd's autopsy found abrasions on her neck and an "impression" on the front and side of her neck that was likely created by her purse strap being tightened against her neck. The examiner ultimately concluded that Shepherd died from asphyxia due to neck compression. The medical examiner collected vaginal, cervical, and rectal swabs from Shepherd.[4] Investigators later determined that the swabs contained male DNA; they then generated a profile from the male DNA and uploaded the DNA profile to the Combined DNA Index System

---

[3] The State did not argue that the man the maintenance worker saw was Kimbro, whose appearance differed from the description that the maintenance worker gave. Indeed, a booking report and photos from Kimbro's arrest on unrelated charges on December 21, 2009 (less than two months after Shepherd's murder), which were admitted into evidence, showed that he was 5′6″ tall and weighed 145 pounds and that he was bald. The State asserted that the man the maintenance worker saw may have been Shepherd's brother, who Shepherd's mother testified was about 6′2″ tall, weighed 195 to 215 pounds, and had dreadlocks. As discussed more below, the defense argued that this man was likely Shepherd's assailant.

[4] The medical examiner testified that there were no acute injuries to Shepherd's genitals and that a sexual assault does not always result in such injuries.

("CODIS") in April 2010.

In September 2010, the GBI was notified that the DNA profile that was uploaded to CODIS matched Kimbro. A GBI forensic biologist then performed a comparison of the DNA profile and Kimbro's reference sample in CODIS and confirmed the match. The GBI notified the lead detective for the case, who determined that Kimbro was in prison for unrelated crimes. The detective testified that although he believed he had probable cause to arrest Kimbro, he never obtained an arrest warrant and did not continue to work on the case, because Kimbro was already in prison and the detective wanted to focus on "the other cases [he] had." The case was eventually classified as a "cold case." In May 2017, an investigator who was assigned to the "cold case" unit reviewed the case file and obtained an arrest warrant for Kimbro; he was arrested in March 2020. Investigators then obtained a buccal swab from Kimbro and performed additional DNA testing, which confirmed that the DNA profile generated from the swabs matched Kimbro.

At trial, the State also presented evidence that on December

21, 2009 (less than two months after Shepherd's murder), Kimbro choked then 22-year-old Robertenette Gordon-Deaver in another motel room in the same motel near Fulton Industrial Boulevard. Gordon-Deaver testified that sometime between 8:00 and 10:00 p.m., she encountered Kimbro, whom she did not know, near the motel, where she was staying, and he agreed to pay her for sex. When they went inside her motel room, he sprayed mace in her face, grabbed her neck with his hands, and choked her. She screamed for help, and a security guard at the motel and a man who was staying in a nearby room ran into Gordon-Deaver's room, scuffled with Kimbro, and eventually handcuffed him and called the police, who arrested him.

Kimbro elected not to testify at trial, but he presented testimony from a detective who reviewed the case in 2014 and determined that there was not probable cause to arrest Kimbro, despite the DNA evidence, because the maintenance worker's description of the man who was with Shepherd about two hours before her body was discovered did not match Kimbro's appearance.

6

Kimbro's primary theory of defense was that although Kimbro had sex with Shepherd at some point before her death, the man with dreadlocks whom the maintenance worker saw killed Shepherd. To rebut that theory, the prosecutor argued that the maintenance worker said the man with dreadlocks left Shepherd's room around 12:45 or 1:15 p.m.—about two hours before Shepherd's body was found—and that there was ample time for Kimbro to encounter, rape, and kill Shepherd during that timeframe.

2. Kimbro contends that the evidence presented at his trial was insufficient—as a matter of constitutional due process and as a matter of Georgia statutory law—to support his convictions for rape and malice murder.[5] This claim fails.

When properly viewed in the light most favorable to the jury's verdicts, the evidence at trial showed that when investigators discovered Shepherd's dead body on the floor of her motel room, the

---

[5] To the extent Kimbro also challenges the sufficiency of the evidence supporting the felony murder counts, those counts were vacated by operation of law, so his challenge is moot. See *Ellington v. State*, 314 Ga. 335, 340 (877 SE2d 221) (2022).

strap of her purse was around her neck; unopened condoms were strewn around her body; her shirt and bra were pushed up, exposing her breasts; her shorts were pulled down, exposing her vagina; her legs were spread apart; and fluid containing Kimbro's DNA was still "leaking" from her vagina. The medical examiner concluded that Shepherd was likely strangled with her purse strap, which caused her death. And although, as Kimbro points out in his appellate brief, the medical examiner determined that there were no acute injuries to Shepherd's genitals, the examiner also testified that a sexual assault does not always result in such injuries.

The evidence presented at trial and summarized above authorized the jury to reasonably infer that Kimbro had sex with Shepherd "forcibly and against her will," see OCGA § 16-6-1 (a) (defining "rape"), just before he strangled and killed her, see OCGA § 16-5-1 (a) (defining "malice murder"), and that he was therefore guilty beyond a reasonable doubt of rape and malice murder. Thus, the evidence was constitutionally sufficient to support his convictions for those crimes. See *Jackson v. Virginia*, 443 U.S. 307,

319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Martinez v. State*, 302 Ga. 86, 86-89 (805 SE2d 44) (2017) (holding that evidence that the victim's dead body was found partially undressed with a phone cord around her neck and that the DNA profile generated from spermatozoa collected from the victim's vagina matched the defendant, who claimed that he did not remember meeting the victim, was constitutionally sufficient to support his convictions for rape and malice murder, even though the victim had no physical injury to her genitalia, and explaining that "'[v]aginal trauma and physical injury are not necessarily a constituent element of the criminal offense of rape'") (citation omitted).

The evidence, though circumstantial, was also sufficient as a matter of Georgia statutory law. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). Kimbro argues that the evidence failed to exclude the reasonable hypothesis that sometime after he had unprotected,

9

"consensual sex" with Shepherd, the unknown man with dreadlocks raped and killed her, leaving behind an insufficient amount of DNA to generate a DNA profile. But the state in which Shepherd's body was discovered—on the floor and partially undressed with fluid leaking from her vagina, which yielded only Kimbro's DNA profile— authorized the jury to reject that hypothesis as unreasonable and to instead find him guilty of rape and malice murder. See *Daniels v. State*, 298 Ga. 120, 121-123 (779 SE2d 640) (2015) (holding that evidence that the dead body of the victim, a prostitute, was partially undressed with her legs spread and that the defendant's DNA profile was generated from spermatozoa found in the victim's vagina was sufficient under OCGA § 24-4-6 (the predecessor to OCGA § 24-14-6) to authorize the jury to reject as unreasonable the defendant's hypothesis that he had consensual sex with the victim shortly before someone else strangled her to death, and to instead find him guilty of rape and malice murder).[6]

---

[6] OCGA § 24-4-6, which was part of the old Evidence Code, was carried into the current Evidence Code in identical form in OCGA § 24-14-6, and there

3. Kimbro next contends, in two related enumerations of error, that the trial court abused its discretion by denying his motion for new trial on the "general grounds" under OCGA §§ 5-5-20 and 5-5-21. See *Drennon v. State*, 314 Ga. 854, 860 (880 SE2d 139) (2022) ("Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is 'contrary to . . . the principles of justice and equity,' OCGA § 5-5-20, or if the verdict is 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21.") (citation and punctuation omitted). But this claim presents nothing for our review. See *King v. State*, 316 Ga. 611, 616 (889 SE2d 851) (2023) ("'[T]he merits of the trial court's decision on the general grounds are not subject to our review,' and the decision to grant a new trial on the general grounds 'is vested solely in the trial court.'") (citations omitted).[7]

---

is no materially identical federal rule of evidence, so our case law interpreting the former provision is still applicable. See *Jackson v. State*, 305 Ga. 614, 619-620 (825 SE2d 188) (2019).

[7] On appeal, the Attorney General argues that Kimbro cites no legal authority to support this claim and that it should therefore be deemed abandoned under this Court's Rule 22, which says, in pertinent part, "[a]ny

11

4. Kimbro argues that the trial court abused its discretion by denying his motion for a continuance. He asserts that a continuance was necessary to allow his trial counsel additional time to prepare for trial, because ten days before the trial began, the prosecutor filed an updated witness list, and eight days before trial, the prosecutor filed additional discovery.[8] But a trial court has broad discretion in ruling on a motion for a continuance, see OCGA § 17-8-22, and we

---

enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned." But we need not decide that issue, because the claim does not warrant our review in any event.

We note that we need not determine in this case the propriety of our past practice of reviewing a general-grounds claim under the sufficiency-of-the-evidence standard set forth in *Jackson v. Virginia*, because as we concluded in Division 2 above, the evidence was constitutionally sufficient to support Kimbro's convictions. See *King*, 316 Ga. at 616 n.8. See also *Muse v. State*, 316 Ga. 639, 653 n.6 (889 SE2d 885) (2023). In addition, to the extent Kimbro claims that the trial court incorrectly applied the standard in *Jackson v. Virginia* instead of properly exercising its broad discretion in reviewing the evidence under the general grounds, the trial court's order denying the motion for new trial clearly shows that the court understood the nature of its discretion and exercised it.

[8] Kimbro also argues that the trial court should have granted his motion for a continuance on the ground that his trial counsel was unable to prepare for the case due to the COVID-19 pandemic, on the ground that the case was a "cold case," and on the ground that the trial court should have conducted an evidentiary hearing on the admissibility of the evidence that Kimbro previously attacked Gordon-Deaver. But trial counsel did not request a continuance on these bases, so Kimbro has not preserved these claims for appellate review. See *Harris v. State*, 304 Ga. 276, 279 (818 SE2d 530) (2018).

12

will not disturb such a ruling without a clear showing that the court abused its discretion, see *Reed v. State*, 314 Ga. 534, 549 (878 SE2d 217) (2022). Kimbro has failed to make that showing here.

At the hearing on the continuance motion, which was held on the first day of jury selection, Kimbro's trial counsel argued that the updated witness list provided contact information for six witnesses and that she would not have time to interview those witnesses before the prosecutor called them to testify. Counsel also noted that most of the additional discovery that the prosecutor had filed contained nothing new, with the exception of two recordings of investigators' interviews with Perkins and the maintenance worker on the day of the murder. The prosecutor responded that she had been asking officers with the police department for the recordings and that she had found them at the department with the physical evidence for the case (rather than in the case file, where she had expected them to be) the day before she notified Kimbro's trial counsel. Kimbro's counsel then said that due to technical issues, she had not been able to play the recordings. The trial court said that it would give

Kimbro's counsel time during the trial to interview witnesses and that the court's Information Technology ("IT") staff would be available to help counsel with any technical issues. The court then denied the motion for a continuance.

We see no abuse of discretion in the trial court's decision to deny Kimbro's motion. As discussed above, the court fashioned appropriate, alternative remedies by allowing trial counsel time to interview witnesses and by offering the services of the court's IT staff. The record shows that during the trial, the court paused the proceedings to provide trial counsel time to interview Perkins before he testified, and counsel testified at the motion for new trial hearing that she interviewed Gordon-Deaver in the hallway outside the courtroom (but that after a few minutes, Gordon-Deaver refused to talk with her). The record also shows that trial counsel did not mention any further technical issues with the recordings. Given these circumstances, Kimbro's claim fails. See, e.g., *Brittian v. State*, 299 Ga. 706, 707-708 (791 SE2d 810) (2016) (concluding that the trial court did not abuse its discretion by denying the defendant's

14

motion for a continuance on the ground that the State added 16

witnesses to its list ten days before trial, because "the trial court

ensured that, during the course of the trial, [the defendant] would

be provided with an opportunity to interview the State's additional

witnesses prior to their testimony being given"); *Collum v. State*, 281

Ga. 719, 723-724 (642 SE2d 640) (2007) (holding that there was "no

error" in the trial court's denial of the defendant's continuance

motion on the grounds that he received "amended witness lists and

additional documentation from the State shortly before trial").[9]

---

[9] Kimbro also asserts that the trial court abused its discretion by denying his trial counsel's request that at the end of each trial day, the prosecutor provide a list of the witnesses she planned to call the next day, but this claim fails. The court acted within the bounds of its considerable discretion to control the trial proceedings, see *Jackson v. State*, 315 Ga. 543, 554 (883 SE2d 815) (2023), and as discussed above, the trial court's remedy of allowing Kimbro time to interview witnesses before they testified was adequate.

It is unclear whether Kimbro contends in his brief on appeal that the prosecutor violated certain discovery statutes. See OCGA §§ 17-16-8 (a) (requiring the prosecutor in a felony case to provide to the defense certain information regarding witnesses "not later than ten days before trial" or "as otherwise ordered by the court") & 17-16-4 (a) (3) (A) (requiring the prosecutor in a felony case to permit the defendant to inspect and copy recordings that the prosecution intends to use in its case-in-chief or rebuttal "no later than ten days prior to trial" or "as otherwise ordered by the court") & (c) (providing that if a party in a felony case discovers additional evidence that is subject to discovery, he "shall promptly notify the other party of the existence of the additional evidence" and make the evidence available). In any event, the trial

5. Kimbro claims that the trial court erred by denying his motion to dismiss the indictment in this case on the ground that the more than 11-year delay between Shepherd's rape and murder in November 2009 and Kimbro's arrest in March 2020 violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. See *United States v. Marion*, 404 U.S. 307, 324 (92 SCt 455, 30 LE2d 468) (1971) (explaining that an inordinate delay between the time a crime is committed and the time a defendant is arrested or indicted may violate due-process guarantees). See also *United States v. Lovasco*, 431 U.S. 783, 784-797 (97 SCt 2044, 52 LE2d 752) (1977) (reversing the district court's dismissal of the defendant's indictment on the ground that the delay between the alleged crimes and the indictment violated his right to due process and explaining that "to prosecute a defendant following

court did not abuse its discretion by employing the remedies discussed above. See OCGA §§ 17-16-8 (a) (stating that if a trial court, for good cause, allows the State to file required witness information late, the court shall permit the defense an opportunity to interview witnesses before they testify) & 17-16-6 (providing several remedies for late-filed discovery, including allowing the defendant to inspect the discovery).

16

investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time").[10] To prevail on this claim, Kimbro must "'prove (1) that the delay caused actual prejudice to his defense, and (2) that the delay was the result of deliberate prosecutorial action to give the State a tactical advantage.'" *Curry v. State*, 291 Ga. 446, 449 (729 SE2d 370) (2012) (citation omitted). After a hearing, the trial court issued an order denying the motion to dismiss, concluding that Kimbro had not established either part of the test. Pretermitting whether

---

[10] We can assume without deciding that Kimbro preserved his Fourteenth-Amendment claim for appellate review, because as discussed below, it fails in any event.

We also note that Kimbro does not contend that his right to a speedy trial under the Sixth Amendment to the United States Constitution was violated. See *Wooten v. State*, 262 Ga. 876, 878 (426 SE2d 852) (1993) (explaining that "[a] pre-trial delay which *follows* an arrest or indictment may violate the right to a speedy trial guaranteed by the Sixth Amendment" but that "[t]he Sixth Amendment does not guarantee a right to a speedy *arrest*"; instead, "an inordinate delay between the time a crime is committed and the time a defendant is arrested or indicted may violate due process guarantees under the Fifth and Fourteenth Amendments") (emphasis omitted and in original). See also *Marion*, 404 U.S. at 320-321 (explaining that "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment" and expressly "declin[ing] to extend the reach of the amendment to the period prior to arrest").

Kimbro has shown actual prejudice, we agree that he has not demonstrated that the State engaged in deliberate delay to gain a tactical advantage. See *Jackson v. State*, 279 Ga. 449, 451 (614 SE2d 781) (2005) (explaining that an appellant's failure to satisfy one part of the test "obviates any need to consider" the other).

Kimbro does not allege in his appellate brief that the delay was an intentional attempt by the State to gain a tactical advantage, and our review of the record supports the trial court's finding that the State had no such intent. Instead, the record shows that the delay from 2010—when investigators learned that Kimbro's DNA matched the DNA profile generated from the swabs taken from Shepherd's body—until 2014 was caused by the lead detective's inaction in failing to obtain an arrest warrant (even though he believed he had probable cause to support a warrant). The delay from 2014—when another detective reviewed the "cold case"—to 2017 was the result of that detective's determination that there was not probable cause to arrest Kimbro, because his appearance did not match the maintenance worker's description of the man who was

18

with Shepherd about two hours before her body was discovered. The record does not indicate the cause of the delay from 2017—when the investigator who was assigned to the "cold case" unit reviewed the case file and obtained an arrest warrant for Kimbro—until March 2020, when he was arrested. In sum, the record supports a finding that part of the delay was the result of the State's inaction, part of the delay was the result of the State's belief that it did not have probable cause to proceed, and part of the delay was caused by unknown reasons. The record does not indicate, however, that the delay was deliberate and designed to give the State a tactical advantage. Thus, Kimbro cannot prevail on this claim. See, e.g., *Hilton v. State*, 288 Ga. 201, 207 (702 SE2d 188) (2010) (holding that the defendant had not shown that the 30-year delay between the crimes and his indictment was the result of deliberate prosecutorial action to give the State a tactical advantage, and therefore had not shown that the delay violated his due-process right, because part of the delay was due to the State's belief that the evidence against the defendant was insufficient to proceed, and part of the delay was due

to "an extended period of inaction on the case by the State," and there was "no evidence showing that this delay was deliberate and designed to gain an advantage"); *Wooten v. State*, 262 Ga. 876, 880 (426 SE2d 852) (1993) (holding that the defendant failed to establish that the 13-year delay between the crimes and his indictment was the result of deliberate prosecutorial action to give the State a tactical advantage, because he argued only that the State was negligent in investigating his case, and nothing in the record indicated that the State had acted in bad faith). See also *United States v. Butler*, 792 F2d 1528, 1534 (11th Cir. 1986) (explaining that "[t]he government's inaction in bringing the case is insufficient, standing alone, to establish that the government's actions were motivated by an attempt to gain a tactical advantage," and rejecting the defendants' claim that a pre-indictment delay violated their Fifth Amendment due-process right).

6. Kimbro argues that the trial court abused its discretion by denying his motion for a mistrial. We disagree.

During the prosecutor's direct examination of the investigator

20

who reviewed the "cold case" file and obtained an arrest warrant for Kimbro, the prosecutor asked about the investigator's training, and he responded that he had "received training from the Federal Bureau of Investigation's Behavioral Science Unit." The prosecutor asked what that training involved, and the investigator said, "That training involved basically the serial killers—." Trial counsel then interrupted and asked to approach the bench, where she moved for a mistrial based on the reference to "serial killers." The trial court denied the motion and offered to give a curative instruction. Trial counsel agreed, and the court then instructed the jury that the court was "strik[ing] from [its] consideration the last testimony from the witness that training involved basically serial killers"; that the testimony "ha[d] nothing to do with this case"; that "[t]he [S]tate's question was not pointed to that type of training"; and that it "was an inadvertent comment."

Assuming without deciding that Kimbro preserved this claim

for appellate review, it fails.[11] "'(T)he decision to grant a mistrial is within the discretion of the trial court and will not be disturbed on appeal unless there is a showing that a mistrial is essential to the preservation of the right to a fair trial.'" *Perkins v. State*, 313 Ga. 885, 896 (873 SE2d 185) (2022) (citation omitted). Here, the investigator's brief reference to "serial killers" was during his explanation of his general training with the FBI; the investigator did not mention Kimbro or the circumstances of this case in connection with that reference. Moreover, the trial court immediately and thoroughly instructed the jury to disregard the reference, and we presume that the jury followed those instructions. See, e.g., id. at 897 (holding that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial when a

---

[11] The State argues that Kimbro failed to preserve this issue for appeal by failing to renew his motion for a mistrial immediately after the trial court's curative instruction and by failing to object to the instruction. But we need not address that issue, because as discussed below, we conclude in any event that the trial court did not abuse its discretion by denying the motion. See *Horton v. State*, 310 Ga. 310, 317 n.8 (849 SE2d 382) (2020) (declining to address whether the appellant failed to preserve a mistrial claim by not renewing "his motion for mistrial after the trial court's curative instruction or object[ing] to the instruction as inadequate," and concluding that the trial court did not abuse its discretion by denying the motion).

testifying witness mentioned the word "gang" only once, without mentioning the defendant's name in connection with the reference, and the trial court immediately instructed the jury to disregard the reference, and noting that "[i]t is well established that a trial court 'can negate the potentially harmful effect of improperly introduced evidence by prompt curative instructions rather than by granting a mistrial'" and that "juries 'are presumed to follow curative instructions in the absence of proof to the contrary'") (citations omitted). Kimbro's claim therefore fails.

7. Kimbro contends that the trial court abused its discretion by overruling several of his objections to certain statements that the prosecutor made during her closing argument. As explained below, we see no reversible error in this respect.

First, Kimbro points to three comments the prosecutor made to the effect that if the jurors believed Kimbro was guilty, they had a "duty" or "obligation" to convict him. Kimbro objected to each of the comments when they were made, asserting that they were a misstatement of the law, and the trial court overruled the objections.

However, when the prosecutor made a fourth comment along those lines, arguing that the jury had "an obligation to convict [Kimbro] of each and every crime in this indictment," the trial court interrupted, saying that it "need[ed] to correct some of the arguments." The court then instructed the jury on the presumption of innocence, the State's burden of proof, and reasonable doubt, explaining, among other things, that the jurors would be "authorized to convict" Kimbro if they found him guilty beyond a reasonable doubt, but that "it would be [their] duty to acquit" Kimbro if the State failed to prove guilt beyond a reasonable doubt. The court repeated these instructions during the final jury charge.

Applying the harmless-error standard, even assuming that the trial court abused its discretion by overruling Kimbro's objections, it is highly probable that any such error did not contribute to the verdicts. See *Allen v. State*, 317 Ga. 1, 8 (890 SE2d 700) (2023) ("'A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict.'") (citation omitted). As discussed above, after the trial court overruled

24

Kimbro's objections, the court interrupted the prosecutor's argument in order to "correct" it, and then thoroughly and accurately instructed the jury on the presumption of innocence, the State's burden of proof, and reasonable doubt. The trial court provided these same instructions during its preliminary charge, and during the final charge, the court repeated the instructions and reiterated that it was the court's duty to instruct on the law that applied to the case. Under these circumstances, any error in the trial court's overruling Kimbro's objections was harmless. See, e.g., *Williams v. State*, 297 Ga. 460, 463 (773 SE2d 213) (2015) (holding that the trial court abused its discretion by overruling the appellant's objection to the prosecutor's misstatement of the law regarding justification during his closing argument, but that the error was harmless because the trial court fully instructed the jury on that point and made it clear that the instruction on the law would come from the court).

Second, just after the trial court provided the instructions discussed above, the prosecutor said, "[T]here is no defense raised

25

by this evidence. The evidence is that this defendant left." Kimbro objected on the ground that the prosecutor's argument improperly shifted the burden of proof to the defense, and the trial court overruled the objection. Kimbro argues that the trial court abused its discretion, but as we have explained, "[a] prosecutor has 'wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion.'" *Ridley v. State*, 315 Ga. 452, 458 (883 SE2d 357) (2023) (citation omitted). Viewed properly in context, the prosecutor's comment merely emphasized to the jury that Kimbro had not successfully rebutted or explained the State's evidence. Thus, the trial court did not abuse its discretion by determining that the statement fell within the permissible bounds of closing argument. See id. (concluding that it was not improper for the prosecutor to point out during closing argument that the defendant had failed to rebut or explain the State's evidence, and explaining that such comments did not amount to an improper burden-shifting argument).

Third, Kimbro alleges that the trial court abused its discretion

26

by overruling his objection to the prosecutor's statement near the end of her closing argument, "I submit to you that there should be no jury nullification." We cannot say that the trial court abused its discretion by concluding that this statement, which essentially encouraged the jurors to decide the case based on the evidence presented, was not improper. Cf. *Menefee v. State*, 301 Ga. 505, 515 (801 SE2d 782) (2017) (explaining that a prosecutor's statements during closing argument urging jurors to draw reasonable conclusions from the evidence are not improper).[12]

8. Kimbro contends that his trial counsel provided constitutionally ineffective assistance in several ways. To prevail on these claims, Kimbro must show that his lawyer's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80

---

[12] Kimbro also points to additional statements made by the prosecutor during closing argument, but the trial court sustained Kimbro's objections to those statements, so his claims regarding them present nothing for our review. See *Lupoe v. State*, 300 Ga. 233, 251 (794 SE2d 67) (2016). Furthermore, to the extent Kimbro argues that the trial court should have granted a mistrial based on the prosecutor's comments, that claim is not preserved for appellate review, because Kimbro did not move for a mistrial on that ground. See *Kessler v. State*, 311 Ga. 607, 613 (858 SE2d 1) (2021).

LE2d 674) (1984). To prove deficient performance, Kimbro must establish that his trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Clark v. State*, 315 Ga. 423, 442 (883 SE2d 317) (2023) (citation and punctuation omitted). See also *Strickland*, 466 U.S. at 688-689. To prove prejudice, Kimbro "must show a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different." *Clark*, 315 Ga. at 442. See also *Strickland*, 466 U.S. at 694. We need not address both components of the *Strickland* test if Kimbro makes an insufficient showing on one. See *Strickland*, 466 U.S. at 697; *Clark*, 315 Ga. at 442. And in reviewing a claim of ineffective assistance of counsel, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we review the court's legal conclusions de novo. See *Davis v. State*, 306 Ga. 430, 432 (831 SE2d 804) (2019).

(a) Kimbro first argues that his trial counsel provided ineffective assistance by failing to fully investigate certain

witnesses. But Kimbro did not raise this claim in his motion for new trial or in any of his amended motions, and the trial court did not rule on it. Thus, he has not preserved this claim for our review. See *Allen*, 317 Ga. at 12 (explaining that "'[i]neffectiveness claims must be raised and pursued at the earliest practicable moment, which for a claim of ineffective assistance of trial counsel is at the motion for new trial stage if the defendant is no longer represented by the attorney who represented him at trial,'" and holding that the appellant forfeited his claim of ineffective assistance of counsel where he did not raise it in his motion for new trial or in the amended motions and the trial court did not rule on it) (citation omitted).

(b) Kimbro next claims that his trial counsel was ineffective for failing to cross-examine Gordon-Deaver. In particular, Kimbro asserts that he attacked Gordon-Deaver because she had robbed his wife, who died before trial, and that counsel should have elicited testimony to that effect from Gordon-Deaver. As the trial court correctly determined in its order denying Kimbro's motion for new

29

trial, Kimbro has not shown that counsel performed deficiently, so he cannot succeed on this claim.

At the motion for new trial hearing, trial counsel testified that she briefly interviewed Gordon-Deaver before she testified, but shortly after the interview began, Gordon-Deaver refused to talk to her. Counsel also testified that she decided not to cross-examine Gordon-Deaver because she did not think it would have been "helpful to . . . Kimbro"; counsel doubted Gordon-Deaver would have admitted robbing, or even knowing, Kimbro's wife, so counsel could not have elicited information about Kimbro attacking Gordon-Deaver to seek revenge; and Gordon-Deaver was "a victim," so "going after her would not necessarily make . . . Kimbro look good in the jury's eyes." Counsel then testified that she believed the better strategy was "to disregard [Gordon-Deaver] as a witness" and to "play up the idea" that the State used her testimony to show Kimbro's propensity to commit the charged crimes, because it had "little evidence" of his guilt. In its order denying Kimbro's motion for new trial, the trial court expressly credited trial counsel's testimony

on this point.

In light of trial counsel's assessment of Gordon-Deaver's potential testimony, we cannot say that no competent attorney would have decided not to cross-examine her. The record supports counsel's testimony that her strategy was to downplay the importance of Gordon-Deaver's testimony about the attack and to instead assert, as she did in closing argument, that the State introduced the evidence to bolster its otherwise weak case against Kimbro. Kimbro has failed to show that this strategy was objectively unreasonable, so he has not proven that his trial counsel was deficient in this respect. See, e.g., *Gaston v. State*, 307 Ga. 634, 642-643 (837 SE2d 808) (2020) (explaining that "'[t]he scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel,'" and holding that trial counsel's decision not to cross-examine a witness and to instead focus his closing argument on the inconsistencies in the witness's testimony was not objectively unreasonable and thus did not amount to deficient performance) (citation omitted); *Lawrence v.*

*State*, 286 Ga. 533, 534 (690 SE2d 801) (2010) (concluding that trial counsel's decision not to cross-examine several of the State's witnesses was "reasonable trial strategy" and that he therefore did not perform deficiently, as counsel "testified at the motion for new trial hearing that he felt that cross-examining the witnesses in question would not have added anything beneficial to [the] defense, because it merely would have given the witnesses a chance to further implicate [the defendant] with their emphasized testimony").

(c) Kimbro argues that his trial counsel provided ineffective assistance by failing to object to testimony from a forensic toxicologist on the ground that it was not relevant under OCGA §§ 24-4-401 ("Rule 401") and 24-4-402 ("Rule 402"). Specifically, Kimbro points to the toxicologist's testimony that his testing showed that Shepherd's blood and urine were negative for gamma hydroxybutyric acid ("GHB").[13] Kimbro has failed to show that his

---

[13] The toxicologist described GHB as having a "sedating" effect and testified that it is sometimes used in "sexual assault situations."

32

trial counsel performed deficiently in this regard.

Rule 401 defines "'relevant evidence'" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under Rule 402, "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules . . . . Evidence which is not relevant shall not be admissible." "The test for relevance is generally a liberal one, and relevance is a binary concept—evidence is relevant or it is not." *Harris v. State*, 314 Ga. 238, 262 (875 SE2d 659) (2022) (cleaned up). Here, the forensic toxicologist's testimony that Shepherd's blood and urine were negative for GHB tended to show that the person who raped and killed her did not drug her with GHB. Thus, the testimony was relevant, and an objection on that ground would have been meritless. Accordingly, trial counsel did not perform deficiently by failing to make such an objection, and this claim of ineffective assistance fails. See, e.g., *Walker v. State*, 311 Ga. 719, 726-727 (859

SE2d 25) (2021) (holding that trial counsel did not perform deficiently by failing to raise a meritless objection to relevant evidence).

(d) Kimbro claims that his trial counsel was ineffective for failing to object to the trial court's refusal to instruct the jury on mere presence and mere association. But the trial court thoroughly and properly instructed the jury on the presumption of innocence and the State's burden to prove beyond a reasonable doubt each essential element of the charged crimes during its preliminary instructions, during the prosecutor's closing argument, and again during the final jury charge. The court also accurately instructed the jury on circumstantial evidence, criminal intent, and the elements of malice murder and rape. Considering the charge as a whole, the jury was adequately informed that it was not authorized to convict Kimbro if he was merely present at the scene of the crimes or if he was merely associated with some other perpetrator. Thus, Kimbro cannot establish that his trial counsel performed deficiently by failing to object to the trial court's refusal to give those instructions.

34

See *Downey v. State*, 298 Ga. 568, 574-575 (783 SE2d 622) (2016) (holding that trial counsel did not perform deficiently by failing to object to the omission of jury instructions on knowledge and shared intent, because the charges as a whole "were sufficient to cover the knowledge and shared intent required" for the defendant to be convicted); *Simmons v. State*, 282 Ga. 183, 188 (646 SE2d 55) (2007) (holding that the trial court did not err by failing to instruct the jury on mere presence and guilt by association, because "mere presence is only a corollary to the requirement that the State prove each element of the crime charged, and . . . the trial court's instructions clearly informed the jury of this requirement").

(e) Finally, Kimbro contends that his trial counsel provided ineffective assistance by failing to request DNA testing of a condom that was found in the toilet in Shepherd's motel room, hairs and fibers taken from Shepherd's purse, and fingernail clippings taken from Shepherd. As the trial court correctly concluded in its order denying Kimbro's motion for new trial, trial counsel did not perform deficiently in this respect, because her decision not to pursue DNA

35

testing was reasonably strategic. Trial counsel testified at the hearing on Kimbro's motion for new trial that she made a strategic choice not to request DNA testing of the condom, hairs, fibers, and fingernail clippings because the results of the testing may have been "inculpatory rather than exculpatory." And the record shows that trial counsel used the lack of DNA testing to advance the defense theory that the case had not been adequately investigated, as counsel emphasized the fact that the State had not tested the condom, purse, or fingernail clippings during her opening statement, during her cross-examination of the "cold case" investigator, and during her closing argument. Because trial counsel's decision not to request DNA testing on the items Kimbro claims should have been tested was not objectively unreasonable such that no competent attorney would have made such a decision, Kimbro has not proven that counsel performed deficiently. This claim, like Kimbro's other claims of ineffective assistance, is meritless. See *Horton v. State*, 310 Ga. 310, 328 (849 SE2d 382) (2020) (explaining that "'decisions as to what witnesses and other

evidence to present are matters of trial strategy and are ineffective only if unreasonable ones that no competent attorney would make,'" and holding that trial counsel did not perform deficiently and thus did not render ineffective assistance by failing to request DNA testing of hairs found on the murder victim's clothing, because "[c]ompetent counsel could reasonably have concluded that further testing might have revealed that the hair indeed was [the defendant's], and that evidence would have been damaging to [the defendant's] defense") (citation omitted); *Green v. State*, 291 Ga. 287, 297 (728 SE2d 668) (2012) (concluding that trial counsel did not perform deficiently and was therefore not constitutionally ineffective by failing to request DNA testing of fecal matter found on the murder victim, because counsel reasonably determined that the testing "would not be helpful or exculpatory").

*Judgment affirmed. All the Justices concur, except Peterson, P. J., not participating.*

Decided October 11, 2023.

Murder. Fulton Superior Court. Before Judge Ellerbe.

*David A. Hoort*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, David K. Getachew-Smith, Sr., Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Chelsea S. Harvey, Assistant Attorney General*, for appellee.